IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HEALTHPORT CORPORATION, a
Delaware corporation

                              Plaintiff,

v.

TANITA CORPORATION OF AMERICA,
an Illinois corporation,

                              Defendant.

CV. 06-419-PK

FINDINGS AND
RECOMMENDATION/ORDER

PAPAK, Magistrate Judge:

Plaintiff Healthport Corporation filed this action for patent infringement against

defendant Tanita Corporation of America ("Tanita") alleging that Tanita's tetrapolar body

composition meters infringe United States Patents Nos. 4,895,163 ("the '163 Patent") and

5,449,000 ("the '000 Patent") (together "patents-in-suit"), which describe a specific tetrapolar

body composition meter.  Tanita has moved for summary judgment on the grounds that the

accused products do not practice the inventions found in the '163 Patent and the '000 Patent.

Page 1 - FINDINGS AND RECOMMENDATION

Tanita has also moved to strike the declaration of Richard S. Wooten, which was filed by

Healthport in support of it's opposition to Tanita's Motion for Summary Judgment.

For the reasons set forth below, Tanita's Motion for Summary Judgment (No. 18) should

be granted in part and denied in part and Tanita's Motion to Strike the Declaration of Richard S.

Wooten (No. 52) is denied as moot.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary

judgment:

> if the pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, show that
> there is no genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). "Summary judgment is appropriate in a patent case, as in other cases,

when there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law." Nike Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 646 (Fed.

Cir. 1994) (citations omitted).

When considering a motion for summary judgment, the district court's role is not to

weigh the evidence, but merely to determine whether there is a genuine fact issue for trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Freeman v. Arpaio, 125 F.3d 732,

735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of the record which it

believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986). Only after the moving party has made such a showing does the

Page 2 - FINDINGS AND RECOMMENDATION

burden shift to the opposing party to show that a genuine issue of fact remains.  See Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial.  See Celotex Corp., 477 U.S. at 322-23; see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); Harper, 877 F.2d at 731.  The opposing party may not rest on conclusory allegations or mere assertions, see Taylor, 880 F.2d at 1045; Leer v. Murphy, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, see Anderson, 477 U.S. at 249-50; Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).  The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Taylor, 880 F.2d at 1045.

## FACTUAL BACKGROUND

**PATENTS IN SUIT**

The patents-in-suit disclose and claim a type of tetrapolar bioelectrical impedance body composition meter.  The Summary of the Invention sections of the patents-in-suit disclose that "[t]he unique system of the present invention provides an accurate valid measurement of the human body composition consisting of fat tissue, lean tissue and body water."  The '163 patent sets forth a bioelectrical impedance body composition system utilizing population specific variables to modify the measured impedance signal of a user.  The output signal is displayed to the user representative of fat tissue, lean tissue, and body water.  Patent '163 claims,

> 1.  A system for acquisition of body impedance data quantitative measurement of the conductive potential of the body, the system

comprising in combination:

(a)  a plurality of electrode sensors for mounting to a patient's body to be analyzed at prescribed locations forming a tetrapolar system;

(b)  mounting means for removably attaching said electrode sensors to a Kelvin Bridge bio-impedance meter system having four terminal leads;

(c)  means for generating a current flow through said electrode sensors at a frequency of from about 40 Kilohertz to about 60 Kilohertz, thereby producing an output range of from about 0 to 1,000 ohms;

(d)  means for accepting input variables comprised of biological patient data including, height, weight, age and sex and bio-impedance signals derived from step (c) to determine a population specific variable and to produce a correspondence [sic] electrical signal;

(e)  means for manipulating electrical signals derived from said means for generating a current flow and said means for accepting input variables to produce a resultant output signal;

(f)  indicator means for said resultant output signal to provide quantitative measurement of conductive potential of said patient's body based on lean tissue content of said patient; and

(g)  means for comparing said resultant output signal with a control signal to produce an output representative of fat tissue, lean tissue, and body water.

2.  The system for body impedance data acquisition as defined in claim 1, wherein one of said electrode sensors is mounted on the dorsal aspect of the patient's right hand.

3.   The system for body impedance data acquisition as defined in claim 1, wherein one of said electrode sensors is mounted at the distal end of the second metacarpal of the patient's right hand.

4.  The system for body impedance data acquisition as defined in claim 1, wherein one of said electrode sensors is mounted in between the medial and the lateral malleoli of the patient's right foot.

5.  The system for body impedance data acquisition as defined in claim 1, wherein one of said electrode sensors is mounted at the distal portion of the first metatarsal of the patient's right foot.

6.  The system for body impedance data acquisition as defined in claim 1, wherein said means of generating a current flow operates at a frequency of about 50 kilohertz.

7.  The system for body impedance data acquisition as defined in claim 1, and further comprising a power supply for the system.

The '000 patent describes a bioelectrical impedance body composition system which further refines the measured impedance signal using segmental impedance and comparison with known anthropometric data to produce an output signal representative of fat tissue, lean tissue, and body water.   Patent '000 claims the same as patent '163 with the following additions,

1. * * * *

(h)  second means for comparing the signal derived from step (g) with known anthropometric data to produce an output signal representative of fat, lean tissue and body water.

(i)  an additional means for generating a current flow through said electrode sensors at frequencies ranging from about 5 KHZ to about 150 KHZ, thereby producing additional bioimpedance signals having an output range from about 0 to 10,000 ohms.

(j)  means for modifying bioimpedance signals from (i) in such a way to predict Total Body Water, Extracellular Body Mass and Intracellular Body Cell Mass for different individuals or changes in the above TBW, ECM and BCM in the same individual over time.

(k)  an additional means for removably mounting electrode sensors to the defined anatomical extremes of segments of the human body (e.g., leg, arm, torso) and means to generate and measure segmental impedance signals;

(l)  an additional means for manipulating total body impedance, segmental impedance and ratios of the above in conjunction with multiple variable frequencies, in order to predict the quantity and

distribution and changes in the quantity and distribution of Total
Body Water, Extracellular Body Mass volume and Intracellular
Body Cell Mass.

* * * *

8.  The system for body impedance data acquisition as defined in
claim 1, wherein said means for generating a variable current
operates between about 5 KHZ to 150 KHZ.

9.  The system for segmental impedance as defined in claim 1,
wherein the said electrode sensors are mounted at the anatomical
extremes of the segment to be measured (e.g., the arm, the leg, the
torso).

The patents-in-suit discuss other methods of measuring body fat, hydro densitometry

(water tank immersion) and skin-fold anthropometry (calipers), and previously known systems

of tetrapolar bioelectric technology.  The patents-in-suit emphasize that the key aspect of the

present invention is to generate more accurate, valid measurements of human body composition.

**TANITA'S PRODUCTS**

Healthport did not specify any accused products in its complaint.  The parties agree,

however, that this infringement action is limited to Tanita's six professional models: TBF-300,

TBF-310, TBF-410, TBF-215, BF-350, and BC-418 ("accused products" or "Tanita's products").

Tanita's nineteen consumer models are not at issue.

All of Tanita's products measure body composition using a well-known bioelectrical

impedance technique where a pair of electrodes pass a weak electrical current through the user's

body, and a second pair of electrodes measures the electrical impedance, including electrical

resistance to that current.

All Tanita body composition monitors require the user to stand barefoot and upright on a

device that resembles a bathroom scale.  When standing barefoot and upright on the Tanita

Page 6 - FINDINGS AND RECOMMENDATION

products, the user's heels and toes are in contact with four metal electrodes.

On all of the Tanita products, the electrode sensors are embedded in the body composition monitor. The electrodes are permanently attached to the monitor's circuit board with soldered wires. They are not connected to the Kelvin Bridge[1] meter via readily or easily detachable plugs or similar mechanisms.

None of the Tanita body composition meters allow a user to input patient-specific anthropometric data, i.e., measurements of the users circumference and/or length of body parts, such as limbs. Certain Tanita products do, however, use one or more biological variables (i.e. height, weight, age, or gender). Also, certain Tanita products use software that includes anthropometric data to analyze the output signal received.

## LEGAL STANDARDS

35 U.S.C. § 271(a) states,

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent.

A determination of patent infringement involves a two-part analysis. Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1476 (Fed. Cir. 1998). First, the claim must be construed to

---

[1]Tanita claims that its products do not utilize a Kelvin Bridge but is willing to concede to the contrary for purposes of this motion only.

determine its scope and meaning. Second, the claim as construed must be compared to the

accused device. Id.

**CLAIM CONSTRUCTION**

The construction of a patent claim is a matter of law exclusively for the court to decide.

Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-89 (1996).    To construe a claim,

the court must consider three sources: the claims, the specification, and the prosecution file

history.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995).  Courts

may hold separate hearings on the issue of claim construction, but such a procedure is not

necessary:

> Markman does not require a district court to follow any particular
> procedure in conducting claim construction. It merely holds that
> claim construction is the province of the court, not a jury. To
> perform that task, some courts have found it useful to hold
> hearings and issue orders comprehensively construing the claims
> in issue. Such a procedure is not always necessary, however. If the
> district court considers one issue to be dispositive, the court may
> cut to the heart of the matter and need not exhaustively discuss all
> the other issues presented by the parties. District courts have wide
> latitude in how they conduct the proceedings before them, and
> there is nothing unique about claim construction that requires the
> court to proceed according to any particular protocol. As long as
> the trial court construes the claims to the extent necessary to
> determine whether the accused device infringes, the court may
> approach the task in any way that it deems best.

Ballard Medican Products v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358 (Fed. Cir. 2001).

The court should first examine the words of the claims themselves in order to define the

scope of the patented invention.  See Dow Chemical Co. v. Sumimoto Chemical, 257 F.3d 1364,

1372 (Fed. Cir. 2001);  Vitronics Corp. v. Conceptric, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Claim language is given its "ordinary and accustomed meaning as understood by one of ordinary

skill in the art." <u>Dow Chemical</u>, 257 F.3d at 1372.

After an examination of the claim itself, the court should review the patent specification "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." <u>Vitronics</u>, 90 F.3d at 1582. "[T]he specification is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." <u>Id.</u>, 90 F.3d at 1582. In <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303 (Fed. Cir. 2005), the *en banc* court confirmed the importance of the specification in claim construction and explained that the importance derives from the statutory requirement that the specification describe the claimed invention "in full, clear, concise and exact terms." <u>Id.</u> at 1316 (quoting 35 U.S.C. § 112, para. 1). In light of that statutory directive, the <u>Phillips</u> court explained, "the specification necessarily informs the proper construction of the claims." <u>Id.</u> at 1316 (citation omitted). "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." <u>Id.</u> quoting <u>Renishaw PLC v. Marposs Societa' per Azioni</u>, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

Finally, the third type of intrinsic evidence that the court may consider is the prosecution history of the patent. The prosecution history includes the complete records of the proceedings before the Patent and Trademark Office, including any re-examination proceedings, and any representations made by the applicant about the scope of the claims. <u>See</u> <u>Vitronics</u>, 90 F.3d at 1582-83.

If analysis of the intrinsic evidence alone resolves any ambiguity in a disputed claim term, "it is improper to rely on extrinsic evidence other than that used to ascertain the ordinary meaning of the claim limitation." Dow Chemical, 257 F.3d at 1373 (citing Vitronics, 90 F.3d at 1582).

**INFRINGEMENT**

After the claims are construed, the claims are compared to the allegedly infringing device. Texas Instruments, Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1563 (Fed. Cir. 1996) (citing Markman, 517 U.S. at 384-86). Infringement exists if each and every limitation of the patent claim is found to exist, exactly or by substantial equivalent, in the accused product or process. CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1365 (Fed. Cir. 2002). Because each element of a claim is material, the patentee must show the presence of every element or its substantial equivalent in the accused device. Charles Greiner & Co. v. Mari-Med Mfg., Inc., 962 F.2d 1031 (Fed. Cir. 1992).

Because the language of a patent claim may not capture every nuance of the invention or describe with complete precision the range of its novelty, "[t]he scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 535 U.S. 722, 731 (2002). This "doctrine of equivalents" allows the owner of the patent "to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." Id. at 733.

**ANALYSIS**

Tanita moves for summary judgment on three grounds. Tanita's first two arguments

Page 10 - FINDINGS AND RECOMMENDATION

apply to both of the patents-in-suit: Tanita argues that its products do not infringe on the patents-in-suit because (1) the Tanita products do not measure patients in a prone position, and (2) the Tanita products do not have a means for removably attaching electrode sensors to the "Kelvin Bridge bio-impedance meter system having four terminal leads."  Tanita's third argument deals with only the '000 patent: Tanita argues that its products do not infringe the '000 patent because they do not allow the user to input anthropometric data.

**PRONE**

Tanita's first argument is that in order to infringe on the '163 or '000 patents, the accused device must measure patients in a prone position.  Tanita points to various statements throughout the specification that the patient must be prone and asks this court to construe the term "patient's body" in the claim to mean "patient's prone body."  Tanita then argues that because none of its devices measure a patient in a prone position, it does not infringe on either of the patents-in-suit. Healthport argues that the statements relied upon by Tanita come from the preferred embodiment and other portions of the specification, and that it is improper to read a limitation from the preferred embodiment or specification onto the claim.

Neither of the patents-in-suit use the term "prone" in their claims.  Both of the patents-in-suit do, however, specifically state in the section titled "Test Procedure" that the patient must be measured prone: "Position the patient prone on a non-conductive surfaced table. . . . The patient must be prone to minimize interference from muscle contractions. (Antagonist muscle contractions in standing or sitting patients create inaccurate Impedance results.)"  The instruction to place the patient prone also appears in the sections titled "Operation" and "Operation Checklist."

Page 11 - FINDINGS AND RECOMMENDATION

The general rule in patent law is that the specification may aid in claim interpretation but particular limitations or embodiments appearing in the specification will not be read into the claims. E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988). Tanita, however, directs the court to a line of cases, beginning with SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337 (Fed. Cir. 2001), stating the proposition that where the specification reveals an intentional disclaimer, or disavowal, of claim scope by the inventor, "the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. ,2005) (citing SciMed, 242 F.3d at 1343-44).

In SciMed, the asserted patent claimed a catheter with two passageways, or "lumens." 242 F.3d at 1339. Although the claims did not on their face specify that the two lumens were coaxial (one inside of the other), the trial court found the discussion in the specification criticizing catheters with dual (side by side) lumens to control. The court held that the claims were limited to coaxial lumens and could not be construed to cover dual lumens. The Federal Circuit affirmed. In its opinion, the Federal Circuit court addressed the argument that the trial court had committed one of the "cardinal sins of patent law – reading a limitation from the written description into the claims." Id. at 1340. The court explained that the district court properly read the claims in view of the specification, of which they are a part. Id. The court noted that "one purpose for examining the specification is to determine if the patentee has limited the scope of the claims." 242 F.3d at 1341 (quoting Watts v. XL Sys., Inc., 232 F.3d 877, 882 (Fed. Cir. 2000)). The court continued, "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of

the claims of the patent, even though the language of the claims, read without reference to the

specification, might be considered broad enough to encompass the feature in question."  Id.

    In Astrazeneca v. Mutual Pharmaceutical Company, Inc., 384 F.3d 1333 (Fed. Cir. 2004),

the asserted patents claimed new pharmaceutical preparations related to extended-release

felodipine tablets for use in treating hypertension.  The claim construction dispute centered

around the term "solubilizer."  The parties agreed that an ordinary and customary meaning as

understood by one of ordinary skill in the art of the term solubilizer would include surface active

agents, known as surfactants, co-solvents, and complexation agents.   The defendant argued,

however, that in the context of the specification and prosecution history, the term solubilizer

encompasses only surfactants.  The Federal Circuit agreed, holding that "the intrinsic evidence . .

.clearly binds Astrazeneca to a narrower definition of 'solubilizer' than the extrinsic evidence

would support."  Id. at 1338.  The court based it's holding on, inter alia, the fact that the

specification clearly disavowed nonsurfactant solubilizers in two ways.  Id. at 1340-41.  First, the

inventors implicitly disavowed nonsurfactant solubilizers by stating in the specification that

"[t]he solubilizers suitable according to the invention *are defined below,*" and then two

paragraphs later, stating  "[t]he solubilizers suitable for the preparations according to the

invention are semi-solid or liquid non-ionic *surface active agents*" Id. at 1339; 1341 (emphasis

in original).  And second, the "Description of the Invention" described "micelle structures" as a

feature of the invention and surfactants were the only solubilizers believed to form micelle

structures in watery environments. Id. at 1341.

Astrazeneca argued that those statements simply addressed features of the preferred

embodiments and should not be read to limit the claims.  The court disagreed, stating,

> Astrazeneca seems to suggest that clear disavowal requires an 'expression of manifest exclusion or restriction' in the form of 'my invention does not include _____.' But again, such rigid formalism is not required: Where the general summary or description of the invention describes a feature of the invention (here, micelles formed by the solubilizer) and criticizes other products (here, other solubilizers, including co-solvents) that lack that same feature, this operates as a clear disavowal of these other products (and processes using these products).

Id. at 1341 (citing SciMed, 242 F.3d at 1340-45).

In Phillips, the Federal Circuit's most recent seminal case on claim construction, the court affirmed the importance of the specification in construing patents:

> The claims, of course, do not stand alone. Rather, they are part of "a fully integrated written instrument," Markman, 52 F.3d at 978, consisting principally of a specification that concludes with the claims. For that reason, claims "must be read in view of the specification, of which they are a part." Id. at 979. As we stated in Vitronics, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." 90 F.3d at 1582.

415 F.3d at 1315.

Here, the patents-in-suit emphasize that the key aspect of the "present invention" is to generate more accurate, valid measurements of human body composition.  As a result, the public is on notice that any statements in the patents concerning how that invention achieves accurate results limit the scope of the claims. See e.g. Aguayo v. Universal Instruments Corp., 356 F. Supp. 2d 699, 727 (S.D. Tex. 2005) (Where the "specification calls an embodiment the 'invention' or the 'present invention,' it is appropriate to limit the claims to theat embodiment.") (citations omitted).  The patents-in-suit then go on to specify that the "patient must be prone to minimize interference from muscle contractions," and warn that the device will not measure accurately if the patient is standing or sitting.  I find that the specification expressly disavows

Page 14 - FINDINGS AND RECOMMENDATION

measurements taken of a standing or sitting patient, and that limitation must be read onto the

claim.[2]  Accordingly, I construe the term "patient's body" in the claims of the patents-in-suit to

mean "patient's prone body."

I also find that based on the record before me, none of the accused products measure a

patient in a prone position.  Rather, the accused products require that the patient stand on a

measuring platform.  In addition, the court notes that counsel for Healthport stated at oral

argument that if the court construed the patents-in-suit to apply only to measurement in the prone

position, then Healthport would concede that none of Tanita's products meet that limitation.

Accordingly, I find that the accused products do not infringe the patents-in-suit, either literally or

by equivalents.

Healthport makes an argument that the doctrine of claim differentiation supports a

construction that is not limited to the preferred embodiment.  Claim differentiation normally

means that limitations stated in dependant claims are not to be read into the independent claims

from which they depend:

> "There is presumed to be a difference in meaning and scope when
> different words or phrases are used in separate claims. To the
> extent that the absence of such difference in meaning and scope
> would make a claim superfluous, the doctrine of claim
> differentiation states the presumption that the difference between
> claims is significant."

Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998).  Claim

differentiation creates a  presumption, it is not a hard and fast rule of claim construction.  Id.

---

[2]This case is slightly different from SciMed in that SciMed addressed what the invention
itself looked like and this case involves how the invention is applied.  Nonetheless, I find that the
language in the patents-in-suit discussed above constitutes a sufficient disavowal such that it
falls under the umbrella of SciMed and its progeny.

Page 15 - FINDINGS AND RECOMMENDATION

Healthport has failed to direct the court's attention to any portion of the claims at issue here that would serve to limit the construction of "patient's bodies" through the application of claim differentiation.

**REMOVABLY ATTACHED**

Tanita's second argument is that the Tanita products do not infringe the patents-in-suit because they do not have a "mounting means for removably attaching said electrode sensors to a Kelvin Bridge bio-impedance meter system having four terminal leads." (Claim 1, paragraph (b).)

Tanita makes a straightforward infringement argument. In other words, Tanita argues that the court is not required to construe any language in paragraph (b) of claim 1, but rather should simply apply the straightforward language of that paragraph. The court finds, however, that some claim construction is required.

Healthport argues that paragraph (b) should be read broadly, and asks the court to construe the term "system" to mean the entire product. Healthport argues that paragraph (b)'s "mounting means" refers to plugs and/or jacks to removably connect components of the system together. In other words, the paragraph describes a system that has four electrode sensors attached to a Kelvin Bridge bioimpedance system and *any* removable attached parts. Under Healthport's line of reasoning, paragraph (b) would read on any product containing a plug allowing something to be joined to the system or any part that is removable.

Tanita argues, and the court agrees, that Healthport's reading is too broad. A Kelvin Bridge is essentially a type of electrical circuit. It is the capacitors and the resistors that form the measuring electronics. A Kelvin Bridge bio-impedance meter system does not include the

analytical components. Read in the context of the entire claim, the court finds that "system" in paragraph (b) refers only to the measuring electronics.

Further, the parts to be "removably attached" are not unlimited, as Healthport suggests. The plain language of paragraph (b) explains that it is the electrode sensors that must be removably attached to the Kelvin Bridge bio-impedance meter system having four terminal leads:

> "mounting means *for* removably attaching electrode sensors *to* a Kelvin Bridge bio-impedance meter system having four terminal leads."

(emphasis added.)  The court reads a Kelvin Bridge "bio-impedance meter system having four terminal leads" as one complete clause.  This construction is supported by deposition testimony of the named inventors confirming that (1) it is the electrode sensors that are to be removably attached via the mounting means, and (2) the electrodes are connected to the four terminal leads.

The undisputed facts are that none of the accused products contain mounting means for removably attaching electrode sensors to a Kelvin Bridge bio-impedance meter system having four terminal leads.  In each of the accused products, the electrode sensors are soldered to the lead wires.  The solder is the mounting means, and it is not easily or readily removable.[3]  In order to disconnect the electrodes from the lead wires, the user would have to apply a soldering iron to heat up and liquify the metal and then pull the wire away from the electrode.  The electrodes and lead wires are housed inside the measuring platform, that is the device that resembles a bathroom scale.  In order to access the electrode and lead wires, the user would have to disassemble the measuring platform by removing screws from the underside of the platform.

---

[3]The parties agree that removably attached" means "easily" or "readily" attached.

In each of the accused products the lead wires are, in turn, permanently connected to the Kelvin Bridge system.  In four of the accused products, models TBF-300, TBF-310, TBF-215, and BF-350, the electrodes, lead wires, and Kelvin Bridge are all contained entirely within the measuring platform. In two of the accused products, models TBF-410 and BC-418, the Kelvin Bridge system is not housed in the measuring platform.  Instead, it is housed inside the column that rises from the measuring platform and supports the display  case.  The TBF-410 has four electrode sensors inside the measuring platform, just like the four models discussed above.  The BC-418 has a total of eight electrodes: four electrode sensors in the measuring platform and an additional two electrode sensors embedded in each of the two devices that the user holds in his hands while standing on the measuring platform.[4]  Despite the fact that the Kelvin Bridge and electrodes are contained in separate parts of the products, the parts are not easily or readily attached.  In order to separate the column from the measuring platform, and thus separate the Kelvin Bridge from the electrodes, the user would have to remove screws from the housing and then unplug a cable that connects between the two pieces. While the two pieces can be detached, they are not easily or readily detached and thus do not infringe on the patents-in-suit, either literally or by equivalents.

**ANTHROPOMETRIC DATA**

---

[4]Even though the BC-418 has eight electrodes, only four of the eight electrodes operate at any one instant in time.  The total system is essentially comprised of five different tetrapolar systems that sequentially take impedance measurements.  Each of the five tetrapolar systems consists of between one and three of the electrodes in the handheld devices and between one and three of the electrodes in the measuring platform.  For example, one of the tetrapolar systems would be three electrodes from the measuring platform and one electrode from the handheld device.  None of the five tetrapolar systems involves the four handheld electrodes together as one system or the four measuring platform electrodes together as one system.

Paragraph (h) of claim 1 in the '000 patent claims a "second means for comparing signal derived from step (g) with known anthropometric data to produce an output signal representative of fat, lean tissue and body water." Tanita argues that the "known anthropometric data" refers to measurements of a patient's circumference and limb length measurements and ratios. As described in the specifications, that anthropometric data is imputed into the body composition meter and then used, with the measured impedance signal and the algorithm programmed in the device, to more accurately determine a particular patient's body fat.

Healthport argues, and the court agrees, that "known anthropometric data" should not be limited to patient specific data, but should be construed more broadly to include anthropometric data that is compiled in a database and applies generally to a population. Nothing in the language of the claim limits the data to patient specific data. Figure 21 of the '000 patent is a screen for the input of patient specific anthropometric measurements. However, in the absence of an express disavowal or other limitation regarding population general anthropometric data, the court will not read the specification onto the claim.

Tanita claims that none of its products use anthropometric data. Healthport has presented evidence, however, that one of the accused products, the BC-418 model, uses anthropometric data compiled from previous studies using DAX, which is, according to the Tanita literature, a method for measuring body composition that was originally designed to measure bone mineral content. In full body scan mode, the body fat percentage, fat mass, and fat free mass of individual body parts (arms, legs, trunk) can also be measured. According to Healthport, this population general anthropometric data fits within the "known anthropometric data"described in paraghaph (h) of claim 1. The court finds that Healthport has presented sufficient evidence to

Page 19 - FINDINGS AND RECOMMENDATION

create a genuine issue of material fact as to whether the BC-418 does use a form of anthropometric data as part of its analysis.   Accordingly, Tanita is not entitled to summary judgment on this issue.

**WOOTEN DECLARATION**

Tanita has also moved to strike the declaration of Richard S. Wooten, which was filed by Healthport in support of it's opposition to Tanita's Motion for Summary Judgment.  In light of the fact that the court has found in Tanita's favor on two of its grounds for summary judgment and did not consider the Wooten declaration in connection with the third ground, the Motion to Strike is denied as moot.

**CONCLUSION**

For the reasons set forth above, Tanita's Motion for Summary Judgment (No. 18) should be GRANTED IN PART and DENIED IN PART and Tanita's Motion to Strike the Declaration of Richard S. Wooten (No. 52) is DENIED AS MOOT.

**SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due April 24, 2007.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this 9th day of April, 2007.

Page 20 - FINDINGS AND RECOMMENDATION

___/s/ Paul Papak_____

Honorable Paul Papak
United States Magistrate Judge